**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

United States of America,

Plaintiff,

v.

Marjorie Isabella-Paule Florendo,

Defendant.

CR-26-02627-TUC-JGZ(MAA)

**REPORT AND RECOMMENDATION**

Pending before the Court is Defendant's Motion to Supress [Doc. 22]. The Government filed a Response [Doc. 26]. Defendant did not file a Reply. An evidentiary hearing was held on August 11, 2026 [Doc. 28]. Defendant was present and represented by counsel. United States Border Patrol Agent ("BPA") Dyllon Brown testified for the Government. Defendant did not call witnesses. Neither party presented exhibits.

Defendant is charged by indictment with one count of conspiracy to transport illegal aliens for profit and two counts of transporting illegal aliens for profit [Doc. 15 (redacted)]. The Motion to Suppress argues BPA Brown executed a vehicle stop without reasonable suspicion in violation of Defendant's Fourth Amendment rights. Defendant seeks exclusion of all resulting evidence. The Government suggests the stop was consensual but argues reasonable suspicion existed.

Having considered the briefing, testimony and arguments, the Magistrate Judge recommends that the motion be denied. Based on the totality of circumstances, a stop occurred but reasonable suspicion existed for the stop.

**The Evidentiary Record**

BPA Brown is stationed at the Brian A. Terry Border Patrol station in Bisbee, Arizona. Hearing Transcript ("HT") at 4:20-24. He is assigned in the field training unit teaching trainees coming out of the Border Patrol academy. *Id* at 4:20-22. He has also served as a field agent. *Id.* at 5:2-6. In May 2026, he was assigned as a field agent covering the area from Bisbee to the Huachuca mountains, focused on apprehending suspected illegal aliens and smugglers. *Id.* at 5:12-18.

On May 3, 2026, BPA Brown started his shift at 6:00 a.m. at the Terry Border Patrol station. HT at 8:21-9:3. Border Patrol uses live-feed cameras to detect illegal aliens and smugglers. *Id.* at 5:22-23. Border Patrol has cameras located on roads, in desert and mountain areas, and in areas used by smugglers to pick up illegal aliens. *Id* at 7:6-13. The camera feeds are controlled and monitored 24/7 at the Border Patrol Tactical Operations Center. *Id* at 7:14-20; 11:23-12:3. Field agents can monitor the camera feeds using their cell phones or computers. *Id.* at 7:20-22; 81-5. BPA Brown had access to the camera feeds and monitored cameras as part of his job. *Id* at 7:23-25; 8:6-20.

At about 6:02 a.m. after starting his shift on May 3, and while at the station, BPA Brown checked the feed on the field cameras. HT at 9:4-6; 22:11-24. He saw a silver vehicle traveling into a rural area near the border. *Id* at 9:15-18; 26:19-23; 29:2-5. BPA Brown is familiar with the areas where smugglers often pick up illegal aliens. *Id* at 6:16-22. He recognized this area as a pickup point commonly used by smugglers. *Id* at 9:19-22. The area has heavy vegetation and is less than a mile from the border, with what BPA Brown describes as "a few" houses and no businesses. *Id.* at 9:25; 23:11-16; 23:17-19.

The vehicle arrived at the area during a Border Patrol shift change. HT at 11:14-16. During a shift change, agents in the field return to the station as the incoming shift comes on duty. *Id.* at 11:5-9. According to BPA Brown, alien smugglers often time their pickups to occur at shift changes because they believe fewer agents are in the field to engage them. *Id.* at 10:12-17; 11:8-9.

/ / /

BPA Brown also reviewed the camera feed from the day before, May 2, 2026. HT 10:4-7. He saw what appeared to be the same silver vehicle travel into the same pickup area on May 2 at around 2:00 p.m., when Border Patrol has an afternoon shift change. *Id.* at 10:4-12; 11:14-15; 19:1-5; 20:1-5. On the May 2 video, BPA Brown saw the vehicle travel into the same area and emerge back out after about 8 to 10 minutes, what BPA Brown characterizes as a quick turnaround, where a vehicle goes to a location then comes back out within a short time, typically within minutes. *Id.* at 6:1-9; 10:16-17.

According to BPA Brown, a quick turnaround is an indication that a vehicle may be engaged in alien smuggling, arriving at an area and leaving back out after taking on passengers. *Id.* at 6:10-15. BPA Brown is familiar with the local vehicles in the area; he did not recognize this vehicle as local. *Id.* at 23:20-24:1. BPA Brown asked the Tactical Operations Center to monitor when the vehicle exited the area to get onto Arizona Street toward Bisbee, Arizona. HT at 11:19-22; 12:7-8; 25:15-21.

BPA Brown set out for the traffic circle in Bisbee. HT at 12:6-8. BPA Brown expected the vehicle would travel from the pickup area to the traffic circle to head further north. *Id.* at 12:14-21; 25:15-21; 28:4-7; 29:12-15.

From the license plate he saw in the video feed on both days, BPA Brown checked the vehicle's registration. HT at 10:20-11:4; 13:10-19; 19:3-7; 20:1-13. The vehicle was registered to a rental company in Phoenix, Arizona, and not to any individual. *Id.* at 13:16-19. BPA Brown did not check whether the vehicle had been rented by the same person on both days or for how long the vehicle had been rented. *Id.* at 19:17-25; 20:10-19.

According to BPA Brown, a rental vehicle is a clue that someone might be engaged in alien smuggling. HT at 6:23-7:5. According to BPA Brown, because Border Patrol has seized personal vehicles engaged in smuggling, smugglers often rent vehicles to avoid losing their own vehicles in the event they are apprehended. *Id.* at 7:1-5; 13:20-25.

BPA Brown saw the vehicle at the traffic circle about 10-15 minutes after the vehicle was at the pickup area. HT at 12:19-13:2; 22:25-26:5; 25:22-25. BPA Brown estimates the distance between the pickup area and traffic circle to be about four or five miles. *Id.* at

26:1-5. Based on the distance, BPA Brown characterized the timing as another quick turnaround, as occurred the previous day. *Id.* at 13:3-5; 25:9-12. BPA Brown estimates the vehicle remained at the pickup area about five to eight minutes. *Id.* at 26:24-27:4.

By the time the vehicle arrived at the traffic circle, BPA Brown had decided to stop the vehicle and do an immigration inspection, but he did not immediately do so. HT at 13:6-8; 15:12-13; 17:14-19. He followed the vehicle at the traffic circle on SR 80 west. *Id.* at 14:4-8. The vehicle traveled below the speed limit, which BPA Brown characterizes as atypical in the area. *Id.* at 14:6-10. According to BP Brown, alien smugglers often travel below the speed limit to avoid attention from law enforcement. *Id.* at 14:11-18.

BP Brown continued to follow the vehicle as it exited the highway into Old Bisbee. HT at 14:20-23. The vehicle pulled into a parking spot. *Id.* at 14:24-15:1. BPA Brown had not yet attempted to stop the vehicle. *Id.* at 15:2-8.

Once the vehicle parked, BPA Brown parked his patrol vehicle behind the vehicle and activated his emergency lights, the same lights he uses to stop a vehicle. HT at 15:10-11; 17:25-18:2; 24:10-12; 24:24-25; 25:8-10. According to BPA Brown, the vehicle was unable to leave. *Id.* at 25:1-2. The driver attempted to exit the vehicle and BPA Brown instructed her to stop and remain seated. *Id.* at 15:11-12; 24:13-18. The driver left the door open and remained in the driver seat. *Id.* at 17:12-18.

BPA Brown approached the vehicle and saw a person laying down in the rear passenger area. HT at 15:14-19. He found another person in the vehicle's back hatch area. *Id.* at 16:11-13. BPA Brown spoke with the two passengers. *Id.* at 16:14-21. It is alleged that the passengers did not have legal status to be in the United States. *Id.*

**<u>The Motion To Suppress.</u>**

Defendant argues a stop occurred and further information was needed for reasonable suspicion. The government's Response argues "[t]he Border Patrol made an initial consensual contact with the defendant when she stopped her own vehicle" but the agent nonetheless had reasonable suspicion for an investigatory stop. Response, Doc. 26, at 1. In support, the government cites BPA Brown's conclusion that the facts fit the pattern for

alien smuggling in this border area, particularly that (1) the vehicle appeared to be nonlocal, (2) the vehicle had made a quick turnaround on two successive days in a known rural pickup area less than a mile from the border, traveling back out from the border further into Arizona, (3) the pickups were during the Border Patrol shift changes when smugglers believe fewer agents are out in the field, (4) the vehicle was registered to a rental company in Phoenix, and (5) the vehicle traveled more slowly than the typical traffic in the area.

**Reasonable Suspicion Standard.**

A law enforcement officer may make an investigatory stop consistent with the Fourth Amendment if reasonable suspicion exists to believe that criminal activity may be afoot. *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (citations omitted). Reasonable suspicion exists when specific facts, together with rational inferences drawn from them, warrant a suspicion that the person has committed or is about to commit a crime. *United States v. Cortez*, 449 U.S. 411, 416-19 (1981); *see also United States v. Valdes-Vega*, 738 F.3d 1074, 1078 (9th Cir. 2013) (defining reasonable suspicion as "a particularized and objective basis for suspecting the person stopped of criminal activity") (citation omitted).

Reasonable suspicion is more than a "hunch," but it is a low bar and does not require probable cause. *Arvizu*, 534 U.S. at 274. Reasonable suspicion requires considerably less indication of wrongdoing than that required to satisfy the preponderance of evidence standard. *Id.* (citing *United States v. Sokolow*, 490 U.S. 1, 7 (1989)).

The Court is to consider the totality of the circumstances that confronted the officer at the time of the stop. *Sokolow,* 490 U.S. at 8; *United States v. Berber-Tinoco*, 510 F.3d 1083, 1087 (9th Cir. 2007). The assessment precludes a "divide-and-conquer analysis" because, though each of the suspect's acts may be innocent, when taken together under the circumstances they may warrant further investigation. *Arvizu,* 534 U.S. at 274. "A determination that reasonable suspicion exists ... need not rule out the possibility of innocent conduct." *Valdes-Vega,* 738 F.3d at 1078-79 (quoting *Arvizu,* 534 U.S. at 277).

The facts underlying reasonable suspicion must be measured against an objective reasonableness standard. *Gonzalez-Rivera v. I.N.S.,* 22 F.3d 1441, 1445 (9th Cir. 1994).

However, an officer is "entitled to assess the facts in light of his experience in detecting illegal entry and smuggling." *United States v. Brignoni-Ponce,* 422 U.S. 873, 885 (1975). An officer's training and experience may be considered in his or her assessment of the facts so long as inferences drawn are objectively reasonable, and the Court is to give such reasonable inferences "due weight." *Arvizu*, 534 U.S. at 273, 277; *see also Cortez*, 449 U.S. at 418; *United States. v. Montero-Camargo*, 208 F.3d 1122, 1131 (9th Cir. 2000).

For stops by Border Patrol agents, the totality of circumstances may include but are not limited to: (1) the characteristics of the area where the vehicle is encountered; (2) the vehicle's proximity to the border; (3) usual patterns of traffic and time of day; (3) patterns and information about previous drug or human smuggling in the area; (4) whether certain types of vehicles are frequently used to transport contraband or undocumented people; (5) erratic behavior on the part of the driver or attempts to evade law enforcement; and (6) whether the vehicle is heavily loaded or has an unusual number of passengers. *Brignoni-Ponce*, 422 U.S. at 884-85. "Not all of these factors must be present or highly probative in every case to justify reasonable suspicion ... [a]nd the facts must be filtered through the lens of the agents' training and experience." *Valdes-Vega,* 738 F.3d at 1079.

If the stop lacks reasonable suspicion, all evidence seized as a result of the stop must be suppressed. *United States v. Morales*, 252 F.3d 1070, 1073 (9th Cir. 2001).

**Discussion.**

The Court finds a stop occurred but reasonable suspicion existed. The characteristics of the area, proximity to the border, information about the vehicle, usual pattern of local traffic, time of day, and behavior of the vehicle, together with reasonable inferences of an experienced Border Patrol agent, support BPA Brown's reasonable suspicion that this vehicle had traveled from Phoenix to a pickup area, had picked up illegal aliens, and was traveling back to Phoenix or elsewhere with its passengers.

An investigatory stop occurs when an officer detains a person for a limited duration to gather information. *See United Farm Workers v. Noem,* 829 F. Supp. 3d 801, 831 (E.D. Cal. 2026) (citing *Terry v. Ohio,* 392 U.S. 1, 27 (1968) and *Adams v. Williams,* 407 U.S.

143, 146 (1972)); *see also United States v. Nault,* 41 F.4th 1073, 1080 (9th Cir. 2022) (finding vehicle and investigatory stops are analyzed under *Terry* principles). Here, the suspect vehicle pulled into a parking spot before BPA Brown initiated a stop. However, BPA Brown pulled his patrol vehicle behind the vehicle, blocking it from leaving, and activated his patrol vehicle's overhead lights, the same lights used when pulling over a vehicle. He then told the driver to stay, and he looked inside the vehicle. These facts add up to detention of the vehicle and driver to gather further information, a stop.

The circumstances and events leading up the stop, however, establish reasonable suspicion. BPA Brown saw the vehicle arrive at a remote area less than a mile from the border, a short walk from Mexico. The area was a known staging area for illegal aliens to be picked up for transport further into the United States. There are no businesses in the area to attract travelers, just a few residences. BPA Brown was familiar with the local vehicles and did not recognize this vehicle. The alleged pickup was during a Border Patrol shift change when, in BPA Brown's experience, alien smugglers believe fewer agents are out in the field to engage them. BPA Brown's registration check showed the vehicle registered to a rental company in Phoenix, characteristic of alien smugglers traveling from urban areas, wary of having their own vehicles seized by Border Patrol if apprehended. About fifteen minutes after being at the pickup area, the vehicle was at the roundabout in Bisbee, where BPA Brown reasonably expected the vehicle to be if it had stayed at the loadout area just long enough to take on passengers and head back north further into the United States. With BPA Brown's patrol vehicle following, the suspect vehicle traveled below the speed limit and below the typical driving speed in the area, characteristic of alien smugglers attempting to be careful to avoid law enforcement. Additionally, BPA Brown had seen what he reasonably believed was the same vehicle make a quick turnaround in the same pickup area during a shift change the previous day, suggesting a pattern.

Defendant argues BPA Brown had no evidence the drivers were the same on the two days he observed the vehicle, and nothing showed who rented the vehicle on each of the two days or for how long the vehicle was rented, suggesting the vehicle could have

been rented for recreational purposes or should not be judged on the activity the previous day. Defendant also argues that driving below the speed limit, especially at or near a roundabout, is not suspicious behavior.

Though certain facts, if they exist, may support reasonable suspicion, no particular facts or combination of facts are necessary. *Valdes-Vega,* 738 F.3d at 1079. The inquiry is whether the facts that do exist, taken together, amount to reasonable suspicion. *Id.*; *see also Brignoni-Ponce,* 422 U.S. at 885. Ruling out innocent behavior is not required. *Valdes-Vega,* 738 F.3d at 1079-80 (citing *Arvizu,* 534 U.S. at 277). Facts that may be insufficient on their own may create reasonable suspicion when considered together. *Id.*

The facts relating to this vehicle and its behavior on May 3, 2026, together with all the events and circumstances, reasonably indicated alien smuggling sufficient to stop the vehicle to investigate whether the activity was innocent.

**Recommendation.**

Based on the foregoing, the Magistrate Judge recommends that the District Judge, after an independent review, deny the Motion to Suppress [Doc. 22]. The parties may file and serve written objections within 14 days of this Report and Recommendation. If objections are not timely filed, the party's right to *de novo* review may be waived.

Dated this 25th day of August, 2026.

Honorable Michael A. Ambri
United States Magistrate Judge